UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PRIMULA MANAGEMENT, LLC,

                                    Plaintiff,

                                                                25-cv-1795 (PKC)

            -against-                                           OPINION AND ORDER


PRIMROSE SCHOOL FRANCHISING
COMPANY LLC,

                                    Defendant.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

            Primula Management, LLC ("Primula") is the management company for five

schools providing early childhood education and childcare services owned in whole or in part by

non-party Matthew Grossman.  (Second Amended Complaint ("SAC") ¶¶ 2, 5.)  Each of the five

schools operated by Primula are franchisees of Primrose School Franchising Company LLC

("Franchisor"), a franchise network of private preschools.  (Id. ¶¶ 2, 5–6.)  Primula, the plaintiff,

alleges that Franchisor, the defendant, misappropriated Primula's trade secrets derived from an

enrollment forecasting application developed by Mr. Grossman and breached the terms of a

"Pilot Agreement" that governed the testing of that application by Franchisor and its franchisees.

            In the SAC, Primula brings several claims against Franchisor, including

misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §

1836 et seq., and New York common law, breach of contract, tortious interference with business

relationships, unjust enrichment, breach of the implied covenant of good faith and fair dealing,

and unfair competition.  Primula has also moved for a preliminary injunction enjoining

Franchisor's disclosure and use of Primula's trade secrets and confidential information.  (ECF 6 & 7.)

Franchisor moved to dismiss the SAC for failure to state a claim and also on the basis of a general release contained in a separate agreement between Grossman and non-party Primrose School Franchising SPE, LLC.  (ECF 37 & 38.)  The Judge to whom the case was originally assigned denied the motion to dismiss.  (ECF 44.)  Shortly thereafter, the action was reassigned to the undersigned, and Franchisor submitted a motion for reconsideration.  (ECF 56.)

On the motion for reconsideration, the Court declines to dismiss the action on the grounds of the general release.  But, as will be explained, the Court will grant reconsideration of the denial of the motion to dismiss the DTSA claim and the state common law claims.

Primula asserts that the trade secrets at issue are the "terminology, concepts and functionality" of Primula's enrollment forecasting application, specifically identifying the use of the phrase "available spaces" and the general concept of the functionality of the application. Neither the application's algorithm, user interface nor its other technical features are part of the claimed trade secret.  The Court accepts that "terminology, concepts and functionality" may indeed qualify as trade secrets.  But the SAC proceeds solely on a disclosure theory of misappropriation and alleges that the Franchisor improperly disclosed these trade secrets in a series of four emails.  A review of those emails reveals that they did not contain any information held as secret by Primula or for which it took reasonable measures to protect.  The SAC reveals that the information had been shared by Primula with others without any confidentiality protection. The Court will dismiss Primula's trade secret misappropriation claim against the Franchisor under the DTSA.

Because Primula properly invokes both federal question jurisdiction and diversity jurisdiction, the Court will also address Primula's state law claims. In each instance, the Court concludes that they do not state a claim for relief.

Upon reconsideration the Court will grant Franchisor's motion to dismiss and will deny Primula's motion for a preliminary injunction.

BACKGROUND.

Primula is a limited liability company that manages five schools located in New York City, Atlanta and Denver that offer early education and childcare services. (SAC ¶ 5.) Each of the Primula-managed schools is owned in whole or in part by Matthew Grossman, Primula's principal and owner. (Id. ¶¶ 5, 10.) The Primula schools were parties to franchise agreements with Franchisor, which operates a franchise network of private preschools. (Id. ¶¶ 5–6.) Franchisor's franchise network includes over five hundred schools in locations across the country. (Id. ¶ 2.)

Franchisor requires franchisee schools to use software from Franchisor's management software provider, Procare. (Id. ¶¶ 16, 84.) According to the SAC, franchisee preschools found it cumbersome to use Procare's software to forecast classroom rosters and open spaces in their classrooms to facilitate the enrollment of new students. (Id. ¶ 14.) For a preschool to do so, it needed to manually input data from multiple sources into spreadsheets, a process that was time consuming and prone to inaccuracies and which inhibited preschools from regularly preparing enrollment forecasts. (Id.) The limitations in Procare's software were known by Franchisor and its franchisees, and Franchisor was aware that some of its franchisees declined to use Procare's software for these reasons. (Id. ¶¶ 14, 30.)

In recognition of the shortcomings of the Procare software, Primula developed its own enrollment management computer application (the "Primula Application") that synthesizes various categories of data to determine the number of "available spaces" in a school. (Id. ¶¶ 10–11.) According to the SAC, "available spaces" refers to the extent to which a classroom has availability for prospective students given factors such as new enrollment in the school via waitlists or inquiry and tour activity, transitions into the classroom because of a student's age or development, transitions out of the classroom due to age or development, and withdrawals from the school. (Id. ¶¶ 11, 52, 61.)

To determine "available spaces," the Primula Application uses an algorithm to compile information on enrollment and withdrawals in schools. (Id. ¶ 11.) The Primula Application can then automatically produce on-demand reports that shed light into whether there is room for prospective students in the school. (Id. ¶¶ 11, 57.) According to the SAC, these features were commercially valuable because they allowed school administrators to avoid manually calculating available spaces and to quickly respond to enrollment inquiries from prospective students. (Id. ¶¶ 11–13.) The SAC alleges that the Primula Application is the only available application of its kind that can produce these automatic, on-demand enrollment reports concerning available spaces. (Id. ¶¶ 12, 59.) Primula rolled out the Primula Application for use in its own schools in the spring of 2023. (Id. ¶ 10.)

Primula deemed the Primula Application to be a success, and Grossman decided to share information about his application with others. (Id. ¶ 27.) In particular, in March 2024, Grossman emailed Denver-area Primrose school owners to inquire about whether they might be interested in testing the Primula Application. (Id. ¶ 28.) In doing so, Grossman noted that the Primula Application was "an automated Enrollment Tracker . . . [that] shows, on-demand, where

and when there are open spaces available across time." (Id.)  Grossman also shared information about the Primula Application with Franchisor, making several presentations to Franchisor executives that detailed the application's capabilities.  (Id. ¶¶ 29–38.)

Franchisor and Primula agreed to implement a pilot program that would allow the Primula Application and its "available spaces" functionality to be tested at additional franchisee schools.  (Id. ¶¶ 40, 42.)  On October 3, 2024, the parties executed a "Pilot Agreement" which governed the pilot program.  (Id. ¶ 41.)  The Pilot Agreement contained a confidentiality provision protecting "all information relating to the Disclosing Party and its respective business operations and/or trade secrets which are not generally known . . . ."  (ECF 55-1 at 5.)  The Pilot Agreement also contained a "Use Restrictions and Acceptable Use" provision, which prohibited Franchisor from, among other things, "attempt[ing] to discover source code or underlying structures, ideas or algorithms of the Application," "us[ing] the Application for any purpose other than evaluating the suitability of the Application," or "access[ing] or us[ing] the Application in order to monitor its availability, performance, or functionality for competitive purposes."  (ECF 55-1 at 4.)   Both parties also had the right to terminate the Pilot Agreement upon written notice.  (ECF 55-1 at 2.)  All franchisee schools participating the pilot program signed a "Trial and Evaluation Agreement" containing confidentiality provisions.  (SAC ¶ 43.)

Meanwhile, since 2019, Franchisor had been working with Procare to develop its own enrollment forecasting tool, referred to as the new Student Age Report.  (Id. ¶ 16–19.)  The new Student Age Report was released by Procare to Primrose franchisees in November 2024.  (Id. ¶ 19.)  However, according to the SAC, the new Student Age Report created by Procare lacked the same functionality of the Primula Application because it only considered one variable, the transition of students out of a classroom due to age, in its determination of forecasted

openings.  (Id. ¶ 52.)  As such, the SAC explains, the new Student Age Report only forecasted vacancies, not available spaces.  (Id. ¶¶ 53–54.)  Accordingly, to determine available spaces, a franchisee would still need to manually input data and generate reports even if they relied on the new Student Age Report.  (Id. ¶¶ 55–56.)

On December 9, 2024, Franchisor sent an email to its franchisees with a "Weekly Tip" for using the new Student Age Report.  (Id. ¶ 46.)  The tip stated the following, in full: "The NEW Student Age Report is now available to provide insights to help you forecast enrollment opportunities.  Primrose Franchise Owners and School Leadership should use this report regularly, in conjunction with your school's waitlist, to understand the available space at your school.  Doing so will assist in quickly responding to parent inquiries and scheduling tours."  (ECF 55-3 at 7.)  According to the SAC, Procare had not used the term "available spaces" in any communications with franchisees regarding the new Student Age Report.  (SAC ¶¶ 25, 49–50.)  Franchisor sent three other communications that contained substantially the same "tip" to all of its franchisees on December 12, 2024, December 23, 2024, and January 31, 2025.  (ECF 55-4 at 5; ECF 55-5 at 7; ECF 55-6 at 5.)

Primula alleges that the statements made in Franchisor's communications with its franchisees were misleading, because the Student Age Report can only forecast vacancies, not available spaces; according to the SAC, this gave franchisees the wrong impression that the Student Age Report—which all franchisees could access through their required subscriptions to Procare's software—had the same functionality as the Primula Application.  (SAC ¶ 63.)  Furthermore, Primula alleges that the emails disclosed Primula's trade secrets: the concept of available spaces and the functionality of the Primula Application in forecasting that metric.  (Id.

¶¶ 24–25, 75).  Moreover, Primula also alleges that these disclosures violated the confidentiality provisions and use restrictions in the Pilot Agreement.  (Id. ¶¶ 62, 73.)

On March 3, 2025, Primula filed its first complaint in this action and moved for a preliminary injunction.  (ECF 1, 6 & 7.)  On March 14, 2025, the same day that the Pilot Agreement was due to expire, Franchisor terminated the pilot program, which ended participating schools' access to the Primula Application.  (SAC ¶ 80; ECF 55-1 at 2.)

Primula's SAC brings seven claims.  Counts One and Three assert trade secret misappropriation under the DTSA and New York common law, respectively.  (SAC ¶¶ 91–100, 110–120.)  Count Two asserts breach of contract by Franchisor of the Pilot Agreement's confidentiality provisions and use restrictions.  (Id. ¶¶ 101–109.)  Counts Four, Five, Six and Seven assert claims of tortious interference with business relationships, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and unfair competition, respectively.  (Id. ¶¶ 121–165.)  The SAC seeks damages and injunctive relief.  (Id. at 44–45.)

On April 25, 2025, Franchisor filed a motion to dismiss Primula's First Amended Complaint ("FAC").  (ECF 37.)  Shortly thereafter, the judge initially assigned to this case denied the motion to dismiss.  (ECF 44.)  Thereafter, the case was reassigned to the undersigned.  Primula subsequently filed its SAC (ECF 55), which is identical to the FAC except as to the FAC's allegations regarding diversity jurisdiction.  Franchisor then filed its motion for reconsideration.  (ECF 56.)  This Court heard oral argument on the motion.

MOTION FOR RECONSIDERATION STANDARD.

"A motion for reconsideration is an extraordinary request that is granted only in rare circumstances, such as where the court failed to consider evidence or binding authority."

Van Buskirk v. United Grp. of Companies, Inc., 935 F.3d 49, 54 (2d Cir. 2019). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).

While a court may grant a motion for reconsideration "to correct a clear error of law or prevent manifest injustice," Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004) (quotation marks omitted), "a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided," Shrader, 70 F.3d at 257. The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court. See Devlin v. Transp. Commc'ns Int'l Union, 175 F.3d 121, 131–32 (2d Cir. 1999).

When, as here, a party requests that a judge reconsider an order of another judge, "the court must be especially wary of attempts to relitigate the same issues before a new audience." Compass, Inc. v. Real Est. Bd. of New York, Inc., 21-cv-2195 (LGS), 2022 WL 2967566, at *1 (S.D.N.Y. July 27, 2022) (Schofield, J.). Even so, the judge to whom a case is reassigned "must stand ready to consider any properly-filed motion, including a motion for reconsideration, on its merits." Peyser v. Searle Blatt & Co., 99-cv-10785 (GEL), 2004 WL 307300, at *1 (S.D.N.Y. Feb. 17, 2004) (Lynch, J.).

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Michael Grecco Products, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir. 2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).

The Court is limited to consideration of the allegations of the complaint but it "is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).  In reviewing a Rule 12(b)(6) motion, the Court assumes all factual allegations in the complaint to be true and draws all reasonable inferences in favor of the non-moving party.  Peretti v. Authentic Brands Group LLC, 33 F.4th 131, 137 (2d Cir. 2022).

DISCUSSION

I. The General Release Does Not Provide a Basis for Dismissal.

With its original motion to dismiss, Franchisor submitted an attorney's declaration annexing a "Termination Agreement" dated March 28, 2025.  (ECF 39 & 39-1.)[1]

---

[1] This action was commenced on March 3, 2025, prior to the date the General Release was executed.  (ECF 1.)

That agreement permitted the assignment and transfer of the assets of a Primrose school franchise to a new owner and franchisee and the limited termination of the old franchise. (ECF 39-1.) Also annexed to the declaration is a General Release executed in relation to the Termination Agreement. (ECF 39 & 39-2.)

In the General Release, the "Franchisee Parties" and their affiliates released "any and all claims" against the "Franchisor" and its affiliates. (ECF 39-2.) The "Franchisee Parties" do not expressly include Primula but do include Harmony Opco, LLC and its owners Matthew S. Grossman, Kim Lewis Barnett and MSGEducation, LLC, and Harmony Realco, LLC. (Id.) The Primrose entity named as the "Franchisor" is "Primrose School Franchising SPE, LLC" ("PSF SPE"). (Id.) PSF SPE was named as a defendant in the original complaint but was dropped from the First and Second Amended Complaints. Primula argues that the General Release has been rescinded and cancelled by Grossman under the doctrine of unilateral mistake.[2]

The General Release is not annexed to any version of the Complaint, nor is the General Release a document of which the Court may take judicial notice. Instead, Franchisor argues that the General Release is "integral" to the SAC. A document is considered to be "integral" to a complaint, and therefore a material the Court may rely on when considering a motion to dismiss, "where the complaint relies heavily upon its terms and effect . . . ." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted) (quoting International Audiotext Network, Inc. v. American Telephone and Telegraph Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). But a plaintiff's "mere notice or possession" of the

---

[2] The General Release is the subject of a rescission or reformation action pending in a Georgia state court. Grossman, et al., v. Primrose School Franchising SPE, LLC, No. 25-cv-03414 (Ga. Super. Ct., Cobb Cty.). The claims and defenses of the parties are not in the record before this Court, but the Court is aware that the Georgia action was temporarily stayed pending the issuance of a decision on the motion for reconsideration. (ECF 65-1.)

document when the complaint is prepared "is not enough" for the document to be deemed integral to the complaint.  Id.

Franchisor's argument that the General Release is integral to the SAC fails.  The General Release is wholly collateral to the claims at issue and was not implicitly raised by the initial complaint that pre-dated the General Release or either of the two amended complaints.  The complaints provide no support for the proposition that Primula relied upon the terms or effect of the General Release when bringing the suit.  See Collison v. Bank of New York Mellon, 17-cv-809 (PKC) (SDA), 2018 WL 2357257, at *1 (S.D.N.Y. Jan. 30, 2018) (release not integral to complaint when "[t]here is nothing in the complaint or in the record before the Court to suggest that [the plaintiff] relied on the terms and effect of the general release in drafting his complaint"); Allen v. Chanel Inc., 12-cv-6758 (RPP), 2013 WL 2413068, at *6 (S.D.N.Y. June 4, 2013) (Patterson, J.) (release agreements not integral to complaint when "Defendant has not shown that Plaintiff relied on" those agreements "in framing her . . . complaint").

Franchisor relies on an inapposite holding in Sira v. Morton, 380 F.3d 57 (2d Cir. 2004), to support the reviewability of the General Release at the motion to dismiss stage.  There, a prisoner's complaint in a section 1983 action referred to a misbehavior report and disposition sheet but failed to cite an order reversing the disciplinary ruling.  Sira, 380 F.3d at 67.  The Court found that reversal order to be integral because without it, the plaintiff's claim would "necessarily have implicated the invalidity" of the punishment imposed on the plaintiff by prison officials (i.e., the loss of good-time credits), which, under a line of Supreme Court case law, would have barred the claim.  See id. (citing Edwards v. Balisok, 520 U.S. 641, 648 (1997); Heck v. Humphrey, 512 U.S. 477, 489 (1994)).  In short, the Sira Court deemed the reversal order integral to (i.e., relied on by) the complaint there because without it the plaintiff could not

have brought his claim.  Nothing about Sira's holding supports the proposition that the General Release, which instead would bar Primula's claim here, was integral to the SAC.

Courts have considered contractual releases on motions to dismiss where the Court's consideration was not contested by the non-movant, where the defense of release was clear from the face of the complaint or materials the Court could consider on a motion to dismiss, or where the motion was converted under Rule 12(d), Fed. R. Civ. P., into a summary judgment motion.  See, e.g., Jose v. Stoler of Westbury, 19-cv-7197 (JMA), 2021 WL 174026, at *2 (E.D.N.Y. Jan. 19, 2021) (considering release where the "Plaintiff does not contest the Court's ability to consider and interpret the General Release at the motion to dismiss stage. . . ."); Cater v. New York, 17-cv-9032, 2019 WL 430266, at *5–6 (S.D.N.Y. Feb. 4, 2019) (Sweet, J.) (determining release barred claims where plaintiff was precluded from challenging its validity because she ratified the release); WSP USA Corp. v. Marinello, 13-cv-4591 (PKC), 2013 WL 6704885, at *1–3 (S.D.N.Y. Dec. 19, 2013) (determining applicability of release that was annexed to the complaint); Morefun Co. v. Mario Badescu Skin Care Inc., 13-cv-9036 (LGS), 2014 WL 2560608, at *1, 3 (S.D.N.Y. June 6, 2014) (Schofield, J.), aff'd, 588 F. App'x 54 (2d Cir. 2014) (claims barred by release that was incorporated by reference into the complaint); Collison, 2018 WL 2357257, at *1–2 (concluding release was not integral to complaint but converting motion to dismiss into a summary judgment motion); Carter v. Ponte, 17-cv-1830 (VSB), 2018 WL 4680995, at *4–6 (S.D.N.Y. Sept. 28, 2018) (Broderick, J.) (considering applicability of release after converting Rule 12(b)(6) motion into Rule 56 motion).  In contrast, Primula disputes the validity of the General Release, which is not otherwise attached to or incorporated by reference into the SAC.  Cf. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 231 (2d Cir. 2016) (A court may only consider a document that is integral to the complaint when it is

"clear that there exist no material disputed issues of fact regarding the relevance of the document." (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006))).  Thus, the Court may not consider the General Release in deciding Franchisor's motion to dismiss.

The Court also declines to convert the motion to dismiss into a summary judgment motion because there has been no discovery, and the validity of the General Release is the subject of ongoing litigation in the courts of the state of Georgia.

II. The SAC Fails to State a Claim for Misappropriation of Trade Secrets.

Primula brings claims of trade secret misappropriation under both the DTSA and New York common law.  The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  Thus, "[t]o state a claim of trade secret misappropriation under the DTSA, a plaintiff must plausibly allege both that: (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret."  Onyx Renewable Partners L.P. v. Kao, 22-cv-3720 (RA), 2023 WL 405019, at *2 (S.D.N.Y. Jan. 25, 2023) (Abrams, J.) (internal quotation marks omitted) (quoting Inv. Sci., LLC v. Oath Holdings Inc., 20-cv-8159, 2021 WL 3541152, at *3 (S.D.N.Y. Aug. 11, 2021) (Daniels, J.)).  Under New York common law, a plaintiff bringing a claim of misappropriation of a trade secret must allege "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc., 23-cv-9000 (PKC), 2024 WL 3835264, at *3 (S.D.N.Y. Aug. 14, 2024) (quoting E.J. Brooks Company v. Cambridge Security Seals, 31 N.Y.3d 441, 452 (2018)).

Because the elements for trade secret misappropriation claims under the DTSA and New York common law "are fundamentally the same," Iacovacci v. Brevet Holdings, LLC, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (Pauley, J.), district courts in this Circuit "often rely on cases discussing misappropriation under New York law to analyze DTSA claims." Aira Jewels, LLC v. Mondrian Collection, LLC, 23-cv-04510 (JLR), 2024 WL 1255798, at *2 (S.D.N.Y. Mar. 25, 2024) (Rochon, J.) (quoting Iacovacci, 437 F. Supp. 3d at 380). The Court will thus analyze Primula's claims under the DTSA and New York common law together. See Rocket Pharms., 2024 WL 3835264, at *3.

Franchisor argues that Primula has failed to state a claim for trade secret misappropriation because (1) Primula did not define with sufficient specificity the trade secrets that Franchisor allegedly misappropriated, (2) the purported trade secrets were widely known among other Primrose franchisees, and (3) Primula failed to take reasonable measures to maintain the secrecy of its purported trade secrets. Although the Court concludes that Primula has described its purported trade secrets with sufficient specificity at this stage, the Court agrees with Franchisor that Primula has not plausibly alleged that the information Franchisor purportedly misappropriated is protectable as trade secrets. As explained in more detail below, Primula's trade secret claims seek protection of the "terminology, concepts, functionality" of the Primula Application (i.e., the "available spaces" phrase and the general idea of what the application does) but not the application's algorithm, user interface or other technical features. These categories of information are not protectable as trade secrets because they were not secret; the SAC makes clear that Primula freely shared such information with other franchisees without any secrecy protections and that the information was otherwise apparent to those franchisees as entities engaged in the same type of business as Primula.

- 14 -

Thus, on reconsideration, the Court will dismiss Primula's trade secret misappropriation claims.

    A.  Primula Has Failed to Plausibly Allege that the "Terminology, Concepts and Functionality" of the Primula Application Are Protectable Trade Secrets.

Under the DTSA, a "trade secret" is defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes" so long as "[1] the owner thereof has taken reasonable measures to keep such information secret" and "[2] the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

Under New York law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Sit-Up Ltd. v. IAC/InterActiveCorp., 05-cv-9292 (DLC), 2008 WL 463884, at *8 (S.D.N.Y. Feb. 20, 2008) (Cote, J.) (quoting Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997)). New York courts consider the following factors when determining whether information constitutes a trade secret: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." N.

Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999) (quoting Ashland Management

Inc. v. Janien, 82 N.Y.2d 395, 407 (1993)).  The most important consideration, however, is

"whether the information was secret."  Broker Genius, Inc. v. Zalta, 280 F. Supp. 3d 495, 514

(S.D.N.Y. 2017) (Stein, J.) (quoting Lehman v. Dow Jones & Co., 783 F.2d 285, 298 (2d Cir.

1986)).

"Though the question of whether proprietary information qualifies as a trade

secret is ordinarily a question of fact not resolvable on a motion to dismiss, courts dismiss claims

involving trade secrets where they are not actually secret or there is no discernible economic

value from them not being generally known."  Amimon Inc. v. Shenzhen Hollyland Tech Co.,

20-cv-9170 (ER), 2021 WL 5605258, at *10 (S.D.N.Y. Nov. 30, 2021) (Ramos, J.) (citing Zirvi

v. Flatley, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020) (Koeltl, J.)).

1.  Primula's Alleged Trade Secrets.

To assess whether Primula has adequately alleged that Franchisor

misappropriated one or more of its trade secrets, the Court must first discern precisely what

information Primula alleges Franchisor misappropriated.  Courts in this Circuit have required

that plaintiffs bringing trade secret misappropriation claims describe the purportedly

misappropriated trade secrets with a degree of specificity.  While the Second Circuit "has not

squarely articulated the precise contours of the specificity requirement in the context of trade

secrets," Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 800

n.9 (2d Cir. 2023), district courts in this Circuit have required plaintiffs to "plead their trade

secrets with sufficient specificity to inform the defendants of what they are alleged to have

misappropriated."  SS&C Techs. Holdings, Inc. v. Arcesium LLC, 22-cv-2009 (TMR), 2024 WL

5186530, at *3 (S.D.N.Y. Dec. 20, 2024) (Reif, J.) (quoting Medidata Sols., Inc., v. Veeva Sys.

Inc., 17-cv-589 (LGS), 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018) (Schofield, J.)).

Nonetheless, "[t]rade secrets need not be disclosed in detail in a complaint alleging

misappropriation." Id. (internal quotation marks omitted). But trade secrets that are described in

"vague and indefinite" terms are not entitled to protection under the trade secret laws. Sit-Up,

2008 WL 463884, at *11 (quoting Heyman v. AR. Winarick, Inc., 325 F.2d 584, 590 (2d Cir.

1963)).

In the SAC, Primula alleges that the trade secrets that Franchisor misappropriated

were "the terminology, concepts, and functionality of the Primula Application." (SAC ¶ 24; see

also id. ¶¶ 25, 47, 62; ECF 58 at 3, 6–7, 13–15.) The "terminology" of the Primula Application

refers to the phrase "available spaces," which the SAC appears to define as "spaces available for

enrollment" using "vacancies . . . by classroom and by month" given "current enrollment, new

enrollment, withdrawals and age or developmental related transitions between classrooms."

(SAC ¶ 11; see also id. ¶¶ 47, 52–54, 61.) The "concepts" and "functionality" of the Primula

Application refer to the central ideas underlying the application, i.e., that it is "an automated

enrollment management computer application whose methodology and algorithms

automatically" can produce "an automated report, capable of regular use, . . . that identifies

spaces available for enrollment," which can be "matched against the waitlist of prospective

students" and thus allows preschools to "quickly respond to inquiry/tour interest in future

enrollment." (Id. ¶¶ 11, 15; see also id. ¶ 47.). These allegations are sufficiently specific to put

Franchisor on fair notice of the information that Primula alleges Franchisor misappropriated.

To be clear, there are no allegations in the SAC that suggest that Franchisor

misappropriated the technical features of the Primula Application. Certainly, the application

itself, its underlying code and algorithm, or its user interface could very well be protectable trade

secrets if there were allegations that Franchisor wrongly acquired, used or disclosed them. See, e.g., LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 498 (S.D.N.Y. 2002) ("New York courts have recognized that computer software, or programs, can be a trade secret."). But there are no factual allegations in the SAC describing any misappropriation of such information.

This understanding of Primula's purported trade secrets as encompassing just the "terminology, concepts, and functionality" of the Primula Application is consistent with the only acts of misappropriation alleged in the SAC: the four communications sent by Franchisor to its franchisees in December 2024 and January 2025. Indeed, in its opposition to the motion for reconsideration, Primula acknowledges that the SAC only pleads a "disclosure theory of misappropriation." (ECF 58 at 18–19; see also SAC ¶ 24 (Franchisor's December 9, 2024 email "is the first known misappropriation of the terminology, concepts, and functionality of the Primula Application.").) See Onyx Renewable Partners, 2023 WL 405019, at *4 (noting that the DTSA identifies three theories of misappropriation: "(1) acquisition, (2) disclosure, or (3) use."). And the only disclosures of Primula's trade secrets alleged in the SAC are Franchisor's four communications to its franchisees, a point Primula conceded at oral argument. (ECF 63, Tr. 19:14–20:8; see also ECF 58 at 18.) Thus, the only trade secrets that could have been misappropriated are those contained in the four communications. Those four communications— which, again, recommended that franchisees use the new Student Age Report "regularly . . . with your school's waitlist, to understand the available space at your school" to "quickly respond[] to parent inquiries"—can be read, at most, to contain the "available spaces" terminology and the basic idea of what the Primula Application can do. (ECF 55-3 at 7; ECF 55-4 at 5; ECF 55-5 at 7; ECF 55-6 at 5.) And those communications certainly did not contain the application itself or information about its algorithm, code, user interface, or other technical components.

Thus, the Court must determine whether the "terminology, concepts and functionality" of the Primula Application are protectable trade secrets. For the reasons explained below, they are not.

2.  The SAC Fails to Plausibly Allege that the Primula Application's Terminology, Concepts and Functionality were Secret or that Primula Took Reasonable Steps to Protect that Information.

As mentioned, the most important consideration when determining whether information is a trade secret is whether the information was actually secret. See Pauwels v. Deloitte LLP, 83 F.4th 171, 181 (2d Cir. 2023) ("[A] trade secret must first of all be secret . . . ." (quoting Schroeder v. Pinterest Inc., 133 A.D.3d 12, 29 (1st Dep't 2015))). The secrecy requirement refers to both "the substantial exclusivity of knowledge of the formula, process, device or compilation of information" and "the employment of precautionary measures to preserve such exclusive knowledge by limiting legitimate access by others . . . ." Broker Genius, 280 F. Supp. 3d at 514 (internal quotation marks omitted). "Although absolute secrecy is not required, a trade secret must be veiled in sufficient secrecy that except by use of improper means, there would be difficulty in acquiring the information." Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d 328, 385 (S.D.N.Y. 2023) (Cronan, J.) (quoting Town & Country Linen Corp. v. Ingenious Designs LLC, 556 F. Supp. 3d 222, 258 (S.D.N.Y. 2021) (Liman, J.)). And "given that trade secrets may appear in a wide variety of forms and types, . . . [w]hat measures are reasonable" to protect the trade secret "must depend in significant part on the nature of the trade secret at issue." Turret Labs USA, Inc. v. CargoSprint, LLC, 21-952, 2022 WL 701161, at *2 (2d Cir. Mar. 9, 2022) (summary order) (internal quotation marks and citation omitted). But where "the party claiming misappropriation disclosed its trade secret to others who are under no obligation to protect the confidentiality of the information[,] its property right is extinguished"

and its claim must fail.  Town & Country Linen, 556 F. Supp. 3d at 258 (brackets, ellipsis and internal quotation marks omitted) (quoting Structured Cap. Sols., LLC v. Commerzbank AG, 177 F. Supp. 3d 816, 835 (S.D.N.Y. 2016) (Rakoff, J.)).

Because Primula fails to plausibly allege that the "terminology, concepts and functionality" of the Primula Application were secret or that it took reasonable measures to protect the secrecy of that information, the Court concludes that that information is not protectable as a trade secret.

As to the "terminology" of the Primula Application (i.e., the phrase "available spaces"), the SAC alleges that "[a]vailable spaces as a term and concept is not generally known . . . ." (SAC ¶ 60.)  But that conclusory allegation is contradicted by other factual allegations in the SAC.  Most tellingly, the SAC describes an email sent by Primula's owner Matthew Grossman in March 2024—months before the start of the pilot program and before any of the purported disclosures made by Franchisor—to other Primrose franchisees in the Denver area proposing that they test the Primula Application in their schools.  According to the SAC, that email described the Primula Application as "an automated Enrollment Tracker . . . [that] shows, on-demand, where and when there are open spaces available across time." (SAC ¶ 28 (emphasis added).)  The use of the "spaces available" phrase in an email with other franchisees without further explanation of what that term specifically described indicates that "available spaces" is simply a phrase commonly used and understood by those in this line of commerce, including the Primrose franchisees.

Generic phrases known by those operating in the same industry are not trade secrets.  See Speedry Chem. Prods., Inc. v. Carter's Ink Co., 306 F.2d 328, 331 (2d Cir. 1962) (noting the rule that "[m]atters of public knowledge or of general knowledge in an industry

- 20 -

cannot be appropriated by one as his secret." (quoting Restatement (First) of Torts § 757)); see also Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 270 (S.D.N.Y. 2014) (Failla, J.) ("[I]nformation that . . . is generally known in an industry cannot be a trade secret . . . ." (internal quotation marks omitted)); Danaher Corp. v. Gardner Denver, Inc., 19-cv-1794 (JPS), 2020 WL 2557744, at *7 (E.D. Wis. May 20, 2020) (fact that term was "not unheard of" even if "relatively uncommon" weighed against finding a trade secret). For this reason, the SAC has failed to plausibly allege that the terminology "available spaces" is a trade secret.

Furthermore, there is no allegation in the SAC that Grossman or Primula attempted to protect the secrecy of the terminology "spaces available" when that term was used in the email to the Denver franchisees. The SAC does not allege that the Denver schools Grossman emailed in March 2024 were bound by any confidentiality agreement that prevented those schools from disclosing information about the Primula Application. See Pauwels, 83 F.4th at 182–83 (affirming dismissal of trade secret claim where plaintiff shared alleged trade secrets with third parties without confidentiality protections). Indeed, the SAC alleges that schools that had access to the Primula Application executed a Trial and Evaluation Agreement with confidentiality provisions with Primula, but there is no allegation suggesting that the Denver schools—which clearly did not have access to the application given Grossman's pitch to them— were subject to any such agreement at the time of Grossman's email. (SAC ¶ 43.) The SAC provides no factual allegations suggesting that these schools were shortly thereafter made parties to any confidentiality agreements. Nor does the SAC allege that the recipients of Grossman's email were among the fifteen Primrose schools that participated in the Pilot Agreement seven months later or the other Primrose schools separately testing the application and therefore subject to any subsequent confidentiality agreement. (See SAC ¶ 2; ECF 55-2 at 4 (showing that as of

May 31, 2024, the only Primrose schools that had been "onboarded" to use the Primula Application were Primrose of Alpharetta and Primrose of Old Bridge; there are no such localities with those names in proximity to Denver).) The SAC therefore makes no assertion that the Denver schools who received Grossman's March 2024 email were restricted from sharing information about the Primula Application in the months thereafter. Because the SAC fails to provide any allegations that Grossman took measures to protect the secrecy of the terminology that Primula purports Franchisor misappropriated through disclosure, Primula has not plausibly alleged that the terminology is a trade secret. See Kairam v. W. Side GI, LLC, 793 F. App'x 23, 28 (2d Cir. 2019) (summary order) (affirming dismissal of DTSA claim because of complaint's failure to allege "what steps [plaintiff] took to keep [its information] secret").

Primula noted at oral argument that the SAC alleges that the email from Grossman to the Denver franchisees "only described the functionality of the Primula Application in very general terms." (SAC ¶ 28.) But the general reference to "spaces available" in the March 2024 email mirrors the unspecific use of "available space" in Franchisor's four communications with its franchisees in December 2024 and January 2025. Indeed, nowhere did Franchisor's communications define "available space" or otherwise use that term in a way that indicated it had some unique, previously secret meaning. Primula has failed to plausibly allege that the term "available spaces" was other than a generic phrase that was widely understood among Primrose franchisees to refer to actual classroom vacancies that were available to be filled.

As to the "concepts and functionality" of the Primula Application, the SAC likewise fails to plausibly allege that those constituted trade secrets. The fact that the Primula Application could be regularly used, in conjunction with schools' waitlists, to quickly respond to

inquiries and tours—the purported concept and functionality of the Primula application that was allegedly disclosed by Franchisor (SAC ¶ 47)—would have been obvious once the application was marketed. Numerous courts in this district have concluded that, when, as here, the idea for a product would be "clear and easy to ascertain" when the "product is placed on the market," that idea "is not entitled to trade secret protection." Hayden v. Int'l Bus. Machines Corp., 21-cv-2485 (VB), 2025 WL 1697021, at *17 (S.D.N.Y. June 17, 2025) (Briccetti, J.); see also My Mavens, LLC v. Grubhub, Inc., 20-cv-4657 (PGG), 2023 WL 5237519, at *19 (S.D.N.Y. Aug. 14, 2023) (Gardephe, J.) (broad concepts and ideas for functionality on a website were not trade secrets because "a new product idea that will be open and visible once brought to market cannot, as a matter of law, constitute a trade secret" (internal quotation marks omitted)); LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 499 (S.D.N.Y. 2002) ("Because the software architecture cannot remain secret once it is marketed, it cannot rise to the level of a trade secret, as a matter of law.").

Furthermore, the SAC alleges that it was widely known among Primrose franchisees and Franchisor that there was significant demand from the Primrose preschools for such a product like the Primula Application, which automated the time-consuming process the preschools used for projecting vacancies. As the SAC notes, "the limitations of [the resources provided by Franchisor to its franchisees] for enrollment forecasting are well known and acknowledged by [Franchisor] and [its] franchisees . . . ." (SAC ¶ 14.) And as the SAC alleges, "the business benefits for [Franchisor] and [its] franchisees of having access to an automated enrollment management system that does not require manual entry were well understood by [Franchisor]," given Franchisor's "discussions in the past few years" with preschool owners regarding the manual process for determining vacancies in their schools. (Id. ¶ 30.) The SAC

- 23 -

further describes how Franchisor asked Procare, its software provider, to build out certain features in the software it provided to its franchisees, including an "enrollment forecasting tool," which Franchisor's President, Steven Clemente, discussed at a town hall for franchisees in February 2024. (Id. ¶¶ 17–18.) The concept of automating processes that are widely used by members of an industry is not protectible as a trade secret. See Speedry, 306 F.2d at 331 (information known in industry cannot be a trade secret); TransPerfect Glob., Inc. v. Lionbridge Techs., Inc., 22-1348, 2024 WL 177726, at *4 (2d Cir. Jan. 17, 2024) (summary order) (claim of misappropriation of "general framework of [plaintiff's] project management software" failed because "[t]he use of . . . generalized business practices is not a secret, let alone a trade secret"); Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 407–08 (1993) (plaintiff's trade secret claim failed where others could "reproduce [certain] calculations without access to the internal computer commands" of the plaintiff's software). Thus, the SAC has failed to plausibly allege that the concepts and functionality of the Primula Application are protectable trade secrets.

Finally, the emails sent to the Denver franchisees by Grossman, which were transmitted without any secrecy protections, contained substantially the same information that Primula alleges was disclosed by Franchisor in its December 2024 and January 2025 communications with its franchisees. Again, Grossman's email noted that the Primula Application was an "automated" enrollment tracker, could be used "on-demand" (i.e., to quickly respond to inquiries), and showed "where and when there are open spaces available across time" (i.e., available spaces). (SAC ¶ 28.) Because the SAC fails to allege that Primula took any steps to protect this information regarding the concept and functionality of the Primula Application at the time of disclosure to the Denver franchisees, it has not plausibly alleged that such information was a trade secret. See Turret Labs, 2022 WL 701161, at *3 (affirming dismissal of

- 24 -

trade secret misappropriation claim where there were no allegations in the complaint that third parties were required to keep alleged trade secret confidential).

Primula cites several cases for the general proposition that courts often conclude that automated processes and methodologies do constitute trade secrets. But critically, unlike in the cases that Primula cites, the SAC does not allege that actual secret information—like the Primula Application's code or algorithm—was misappropriated by disclosure, the sole theory on which Primula relies.

In the cases cited by Primula, the plaintiffs, in contrast to Primula, alleged misappropriation of underlying technical features of software that would not be publicly accessible. See Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 801–02 (2d Cir. 2023) (alleged misappropriation of software code, scripts and framework for updating a database); Recon Grp. LLP v. Lowe's Home Centers, LLC, 743 F. Supp. 3d 737, 743 (W.D.N.C. 2024) (alleged misappropriation of "inner workings of [plaintiff]'s [s]oftware"); Serrala US Corp. v. Paschke, 21-cv-907 (TKW) (EMT), 2022 WL 2234971, at *3 (N.D. Fla. May 16, 2022) (alleged misappropriation of plaintiff's data archiving methods and solutions). But, in this case, the "terminology, concepts and functionality" that were allegedly misappropriated were generic and known to members of Primula's industry, were revealed by Primula itself in communications with other Primrose franchisees and would have been immediately known to users upon the product's release.

For all these reasons, Primula has failed to allege that the "terminology, concepts, and functionality" of the Primula Application are protectable trade secrets. Thus, upon reconsideration, the Court will grant Franchisor's motion to dismiss as to Counts One and Three of the SAC.

III. The SAC Fails to Plausibly Allege that Franchisor Breached the Pilot Agreement.

To state a claim for breach of contract under New York law, a "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).[3]  Primula alleges that Franchisor "breached the Section 11.1 confidentiality provisions of the Pilot Agreement" because it "failed to maintain the confidentiality of Primula's proprietary trade secrets and confidential information related to the Primula Application." (SAC ¶ 103.)  Furthermore, Primula alleges that Franchisor breached the use restrictions of the Pilot Agreement by "enter[ing] into the Pilot Agreement in bad faith to obtain the ideas of the Primula Application, including its terminology, concept and functionality of 'available spaces' to leverage for [Franchisor]'s release of the new Procare Student Age Report." (Id. ¶ 104.)  Franchisor does not dispute that the Pilot Agreement was enforceable and that Primula adequately performed under that contract.  Franchisor instead argues that the SAC fails to plausibly allege that it breached the Pilot Agreement.

Section 11 of the Pilot Agreement is entitled "Non-Disclosure." (ECF 55-1 at 5.) Subsection 11.1 states, in relevant part, the following:

> [T]he Receiving Party agrees that (i) all information relating to the Disclosing Party and its respective business operations and/or trade secrets which are not generally known and are used by the Disclosing Party to gain competitive advantage in the course and conduct of its respective current and/or proposed business operations furnished to or observed by the Receiving Party or its Representatives (as defined herein), whether prior to or after the date of this Agreement and irrespective of the form of communication, in connection with the Pilot (such information, notwithstanding the absence of a mark signaling the

---

[3] The Pilot Agreement does not contain a choice of law provision, and the parties' briefing assumes that New York law applies. (See ECF 7 at 17; ECF 38 at 25.) "[S]uch implied consent . . . is sufficient to establish choice of law." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) (internal quotation marks omitted) (quoting Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 138 (2d Cir. 2000)).

confidential nature of such information, together with notes, guides, documentation, training materials, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon prepared by the Disclosing Party or its Representatives and any Evaluation Material, being referred to herein as the "Confidential Information") will be kept strictly confidential.

(Id.) The confidentiality provision also requires that the "Confidential Information will not be used in any way detrimental to the Disclosing Party" and that "the Receiving Party shall not divulge any such Confidential Information . . . to any third person." (Id.) Importantly, subsection 11.2 states that the information protected by the confidentiality provision "does not include information which (i) is or becomes . . . generally available to the public . . . ." (Id. at 6.)

The SAC alleges that Franchisor breached section 11 of the Pilot Agreement by disclosing the "terms, functionality, and concepts" of the Primula Application in its four communications to its franchisees in December 2024 and January 2025. (SAC ¶¶ 54, 62, 103.) To the extent that those communications can be construed as revealing any information about Primula or its application—and it is not evident that they can be—any of the information purportedly disclosed was "generally available to the public" and therefore carved out of subsection 11.1's definition of "Confidential Information." (ECF 55-1 at 6.) As discussed with regard to Primula's trade secret claims, the SAC alleges that Grossman pitched his application to Denver-area schools in a March 2024 email that contained substantially the same information that Franchisor is alleged to have disclosed regarding the Primula Application's terminology, concepts and functionality. (SAC ¶ 28.) Again, both the email to the Denver schools and Franchisor's December 2024 and January 2025 communications to its franchisees used the terms "spaces available" or "available space" and generally discussed using software to promptly determine spaces available. And franchisees were well aware of the value of automating the manual calculation of vacancies in classrooms. (See SAC ¶¶ 14, 30, 56.) Accordingly, the SAC

- 27 -

fails to plausibly allege that Franchisor breached the confidentiality provisions of the Pilot Agreement.

Primula argues that another provision of the Pilot Agreement brings the information disclosed in Franchisor's emails back under the protection of the agreement's confidentiality provisions. Subsection 11.2 states that "[d]isclosures made to the Receiving Party which are specific shall not be deemed to be within the foregoing exceptions [including that for publicly available information] merely because they are embraced by more general information in the public domain or in such possession of the Receiving Party." (ECF 55-1 at 6.) But nothing about Franchisor's December 2024 and January 2025 communications to its franchisees—which merely stated that preschools "should use this report regularly, in conjunction with your school's waitlist, to understand the available space at your school"—was more "specific" than the information about the Primula Application that was publicly available. (ECF 55-3 at 7.) In fact, the email sent by Grossman to the Denver-area schools was more specific, since it clearly referred to the capabilities of the Primula Application, while Franchisor's communications to its franchisees make no reference to Primula or its application at all. Thus, the SAC fails to plausibly allege that Franchisor breached the confidentiality provisions of the Pilot Agreement.

The SAC also alleges that Franchisor violated the use restrictions contained in section 5 of the Pilot Agreement by obtaining the Primula Application's "terminology, concept, and functionality of 'available spaces' to leverage for [Franchisor]'s release of the new Student Age Report . . . ." (SAC ¶¶ 72–73, 104.) Section 5.3, labeled "Use Restrictions and Acceptable Use," states in relevant part that "[Franchisor] agrees not to (nor allow any third party to): (a) reverse engineer, decompile, disassemble or otherwise attempt to discover source code or

underlying structures, ideas or algorithms of the Application . . .; (c) use the Application for any purpose other than evaluating the suitability of the Application to meet [Franchisor's] requirements or for the benefit of any third party other than PSFC franchise owners . . .; [or] (e) access or use the Application in order to monitor its availability, performance, or functionality for competitive purposes . . . ."  (ECF 55-1 at 4.)

Even assuming that the use restrictions of the Pilot Agreement did apply to Franchisor,[4] the SAC fails to allege how Franchisor's "use" of the Primula Application could have violated the provisions of that section as understood by their plain meaning.  Subsection 5.3(a) bars Franchisor from acting to "reverse engineer, decompile, disassemble or otherwise attempt to discover source code or underlying structures, ideas or algorithms of the Application." (ECF 55-1 at 4.)  Even if the term "ideas" in this subsection could be understood to encompass what was disclosed in Franchisor's communications to its franchisees, the "available spaces" terminology and general concepts and functionality of the Application as being able to automatically calculate available spaces were well-known to Franchisor before it entered the Pilot Agreement.  The SAC describes in detail several presentations Grossman gave to Franchisor regarding the general functionality of the Primula Application in the months before the execution of that agreement.  (SAC ¶¶ 31–38.)  Indeed, the slide deck used by Grossman in those presentations stated that the application's "dashboard . . . shows available spaces by classroom," that the application "automatically matches the Waitlist with Available Spaces" and the application provides "on-demand information about available spaces." (Id. ¶ 31.)  Grossman

---

[4] In its motion to dismiss, Franchisor argued that the SAC failed to allege that the provisions of section 5.3 even applied to Franchisor.  Specifically, Franchisor asserted that section 5 of the Pilot Agreement contains an introductory clause which states that "[i]f and to the extent that [Franchisor] has 'test schools' with an account in the Application during the Pilot, the following terms apply to such test schools." (ECF 55-1 at 3.)  The SAC does not allege this condition was satisfied.

also performed a live demonstration of the application to Franchisor executives during one of the presentations. (Id. ¶ 38.) Franchisor therefore could not have "attempt[ed] to discover" these ideas of which it was already well aware. Similarly, the SAC does not plausibly allege that Franchisor violated subsection 5.3(c) by "us[ing] the Application for any purpose other than evaluating the suitability of the Application" or subsection 5.3(e) by acting to "access or use the Application in order to monitor its availability, performance, or functionality for competitive purposes" when it already knew the basic functionality of the Application before it entered the Pilot Agreement.

For these reasons, Primula's breach of contract claim contained in Count Two of the SAC will also be dismissed.

IV. The SAC Has Failed to State a Claim of Tortious Interference with Business Relationships.

To state a claim for tortious interference with business relationships under New York law, a plaintiff must allege that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." Catskill Dev., L.L.C. v. Park Place Ent. Corp., 547 F.3d 115, 132 (2d Cir. 2008). As to the third element, the requirement that the defendant use "wrongful means" in interfering with the alleged business relationship, New York courts follow the "general rule" that "the defendant's conduct must amount to a crime or an independent tort." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004). "Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with . . . nonbinding economic relations." Id.

Primula's claim of tortious interference with business relationships is premised on the same conduct underlying Primula's trade secret misappropriation and breach of contract claims: Franchisor's purported "misappropriating [of] Primula's proprietary trade secret and confidential information related to the Primula enrollment management application in at least four separate communications to all of [Franchisor]'s franchisee schools across the country." (SAC ¶ 123.) Specifically, Primula claims that these communications "prevented and continue to prevent third parties from entering into business relationships with Primula for the purpose of obtaining the benefits of the Primula Application." (Id. ¶ 124.)

For the reasons explained above, Primula has not plausibly alleged that Franchisor engaged in tortious conduct—either by misappropriation of trade secrets or breach of contract—by sending the four communications to its franchisees. Nonetheless, a plaintiff may successfully plead a tortious interference claim even if the plaintiff fails to allege independently tortious conduct if the complaint alleges that the "defendant engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiffs." Carvel, 3 N.Y.3d at 190 (internal quotation marks omitted). Importantly, however, "[a] motive of 'normal economic self-interest' is inconsistent with a sole purpose of inflicting intentional harm." Hassan v. Deutsche Bank A.G., 515 F. Supp. 2d 426, 430 (S.D.N.Y. 2007), aff'd sub nom. Hassan v. Deutsche Bank AG, 336 F. App'x 21 (2d Cir. 2009) (quoting Carvel, 3 N.Y.3d at 190).

The SAC does allege in conclusory fashion that, in sending the communications to its franchisees, Franchisor's conduct "was motivated solely by malice and/or to inflict injury on Primula by unlawful means." (SAC ¶ 125.) But this assertion must be supported by factual allegations to sustain a claim of tortious interference. See Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., 206 F. Supp. 3d 869, 911 (S.D.N.Y. 2016) (Koeltl, J.).

To the contrary, the SAC provides factual allegations that plainly support that Franchisor was, at least in part, motivated by its own economic self-interest in sending the communications, and not solely to harm Primula. In particular, the SAC alleges that Franchisor sought to "leverage" the terminology, concepts and functionality of the Primula Application "for [Franchisor]'s release of the new Student Age Report" and use them "for competitive purposes." (SAC ¶ 73; see also id. ¶¶ 116, 139, 158.) This allegation of Franchisor's economic motives is fatal to Primula's assertion that Franchisor was motived solely by malice. See, e.g., Carvel, 3 N.Y.3d at 190 (defendant did not act solely to harm plaintiffs when plaintiff franchisees alleged that defendant induced customers to purchase directly from defendant instead of its franchisees to increase its own profits); In Touch Concepts, Inc. v. Cellco P'ship, 949 F. Supp. 2d 447, 479 (S.D.N.Y. 2013), aff'd, 788 F.3d 98 (2d Cir. 2015) (dismissing tortious interference claim when the complaint alleged that defendants withheld approval of sale of store locations "to enrich themselves, unjustly, by wrongly taking [the plaintiff's] business . . . with no compensation" (internal quotation marks omitted)). Because the SAC alleges that Franchisor "acted in [its] own economic self-interest and therefore did not act *solely* to harm" Primula, the tortious interference claim must be dismissed. Id. (emphasis in original).

In its brief opposing Franchisor's motion for reconsideration, Primula appears to refer to Franchisor's termination and non-renewal of the pilot program as the action taken by Franchisor that interfered with Primula's business relationships. (See ECF 58 at 19–20.) But the section of the SAC setting out the tortious interference cause of action contains no reference to the non-renewal of the pilot, and thus the Court may find that the SAC has not adequately alleged tortious interference on that ground. See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012) (Karas, J.). And even if Primula had

alleged that Franchisor's termination or non-renewal of the pilot program amounted to tortious interference with Primula's business relationships, the claim would still fail because the Pilot Agreement expressly provided that the pilot program would expire on March 14, 2025 without further agreement between the parties and permitted either party to terminate the pilot program upon written notice. (ECF 55-1 at 2.) See In Touch Concepts, 949 F. Supp. 2d at 477 (defendants' exercises of discretion afforded by contractual provisions are not "wrongful means" for tortious interference claim).

The Court will therefore dismiss the claim of tortious interference with business relationships contained in Count Four of the SAC.

V. Primula's Unjust Enrichment Claim Will Be Dismissed as Duplicative.

To state a claim for unjust enrichment under New York law, a plaintiff must allege that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004).

However, "claims in quasi-contract such as unjust enrichment . . . are ordinarily precluded if a valid and enforceable written contract . . . govern[s] the relevant subject matter." Goldberg v. Pace Univ., 88 F.4th 204, 214 (2d Cir. 2023) (internal quotation marks omitted) (quoting Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 587 (2d Cir. 2006)). Nonetheless, "a plaintiff may plead unjust enrichment . . . claims in the alternative if there is a dispute over the existence, scope, or enforceability of the putative contract . . . ." Id. at 214–15 (internal quotation marks omitted) (quoting Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 263 (2d Cir. 1999)).

Primula's unjust enrichment claim is based on the same conduct underlying its breach of contract claim:  Franchisor's purported disclosure of its trade secrets and confidential information related to the Primula Application through the four communications sent to Franchisor's franchisees.  (See SAC ¶¶ 130–133; ECF 58 at 21.)  And Primula does not dispute the existence and enforceability of the Pilot Agreement, nor does it dispute that the Pilot Agreement governed Franchisor's obligations regarding the disclosure of information about the Primula Application.  Thus, because Primula's unjust enrichment claim relies on the same set of facts as the breach of contract claim, the unjust enrichment claim in Count Five of the SAC must be dismissed as duplicative.  See Bytemark, Inc. v. Xerox Corp., 342 F. Supp. 3d 496, 512 (S.D.N.Y. 2018) (Gardephe, J.) (dismissing unjust enrichment claim as duplicative of contract claim alleging use and disclosure of plaintiff's confidential information, when the claims were "based on the same factual allegations").  This conclusion is not altered by the fact that the Court has dismissed Primula's breach of contract claim.  See Tapinekis v. Pace Univ., 22-1058-cv, 2024 WL 2764146, at *2 (2d Cir. May 30, 2024) (summary order) (affirming dismissal of unjust enrichment claims as duplicative after affirming dismissal of breach of contract claims based on the same conduct); Gordon v. Hain Celestial Grp., Inc., 16-cv-6526 (KBF), 2017 WL 213815, at *7 (S.D.N.Y. Jan. 18, 2017) ("an unjust enrichment claim cannot remedy the defects" of plaintiff's other claims (quoting Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 791 (2012))).

VI. The SAC Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

"Under New York law, parties to an express contract are bound by an implied duty of good faith . . . ."  Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002) (quoting Fasolino Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir.

1992)).  "The implied covenant of good faith and fair dealing prevents any party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Gaia House Mezz LLC v. State St. Bank & Tr. Co., 720 F.3d 84, 93 (2d Cir. 2013) (internal quotation marks omitted) (quoting Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995)).  "The doctrine is employed when necessary to effectuate the intentions of the parties, or to protect their reasonable expectations."  Id. (quotation marks omitted) (quoting M/A–COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)).  But the implied covenant of good faith and fair dealing does not "create independent contractual rights." Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC, 706 F. Supp. 3d 409, 432 (S.D.N.Y. 2023) (Rochon, J.), aff'd, 24-159-cv, 2025 WL 1374732 (2d Cir. May 13, 2025); see also Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd., 257 F. Supp. 3d 348, 360 (S.D.N.Y. 2017) (Pauley, J.) (the implied covenant "does not add to the contract a substantive provision not included by the parties.").

The SAC alleges that Franchisor breached the Pilot Agreement's implied covenant of good faith and fair dealing by "misappropriating and unlawfully using and disclosing Primula's proprietary trade secrets and confidential information to develop, market, and sell competing products and services and to solicit existing and prospective clients away from Primula."  (SAC ¶ 139.)  The SAC further alleges that Franchisor violated the implied covenant "by entering into the Pilot Agreement without informing Primula that Defendant was simultaneously developing and recommending using the free new Procare Student Age Report to the 500 plus network of franchisees with the terms, concepts, and functionality of the Primula Application."  (Id. ¶ 150.)  Thus, the SAC concludes, "Primula was deprived of the benefits of the Pilot Agreement."  (Id. ¶ 151.)

Franchisor's alleged misappropriation of Primula's trade secrets and confidential information cannot sustain Primula's claim, because that same conduct underlies Primula's breach of contract claim. "[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013). To the extent that the claim is based only on the purported misappropriation of trade secrets or confidential information, then Primula has not stated a claim of breach of the implied covenant of good faith and fair dealing. See MBIA Ins. Corp. v. Merrill Lynch, 81 A.D.3d 419, 419–20 (1st Dep't 2011) (dismissing implied covenant claim as duplicative of breach of contract claim).

The SAC's allegations that Franchisor failed to inform Primula of Franchisor's development and recommendation of the new Student Age Report are likewise insufficient to state a claim for the breach of the implied covenant. Primula has plausibly alleged that Franchisor was aware that Procare, its software vendor, was developing the new Student Age Report—which was intended to serve as an enrollment forecasting tool—at the time that Primula and Franchisor were negotiating and entered into the Pilot Agreement and when the parties were conducting the pilot program. (See SAC ¶¶ 140–146, 149.) But the SAC does not plausibly allege that Franchisor acted in bad faith by failing to inform Primula of the development and recommendation of that tool.

Primula's allegations as to the alleged breach of the implied covenant of good faith and fair dealing are conclusory and do not show facts that support that the pleader is entitled to relief. The SAC alleges that "Primula was deprived of the benefits of the Pilot Agreement," but fails to explain how that is the case. (SAC ¶ 151.) The section of the SAC

describing the cause of action as to the implied covenant does not cite to any provision of the Pilot Agreement—other than that providing for exemplary damages and attorneys' fees—to explicate how Franchisor's failure to inform Primula of the development and recommendation of the new Student Age Report prevented Primula from receiving the benefit of what it bargained for in the Pilot Agreement. On this basis, Count Six is properly dismissed. See In Touch Concepts, 949 F. Supp. 2d at 472.

Indeed, the Court can discern no aspect of the Pilot Agreement that supports the conclusion that Franchisor had any implied obligation to alert Primula to Procare's development of the new Student Age Report or to refrain from recommending that tool to its franchisees. The covenant "only applies where an implied promise is so interwoven into the contract as to be necessary for effectuation of the purposes of the contract." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407 (2d Cir. 2006) (internal quotation marks omitted) (quoting M/A–COM Sec., 904 F.2d at 136). This is only the case when "a party's action . . . directly violate[s] an obligation that may be presumed to have been intended by the parties." Id. at 407–08 (internal quotation marks omitted) (quoting M/A–COM Sec., 904 F.2d at 136). The Pilot Agreement describes its purpose as enabling Franchisor and Primula "to conduct a proof of concept test by testing the use of the Application in certain Schools mutually agreed by the parties . . . to gain data and feedback from Franchisees and [Franchisor]'s support staff to enable both parties to further evaluate the effectiveness of the Application and whether the use of the Application should be expanded in [Franchisor]'s franchise system." (ECF 55-1 at 2.) The obligations expressly imposed on the parties by the Pilot Agreement are consistent with that purpose and include onboarding preschool participants in the pilot and collecting and analyzing data. (See

ECF 55-1 at 8–11.)  No reasonable reading of the Pilot Agreement supports the implied obligations Primula alleges.

Primula has therefore failed to state a claim of breach of the implied covenant of good faith and fair dealing, and Count Six will be dismissed.

VII. Primula's Unfair Competition Claim Will Be Dismissed.

To state a claim of unfair competition under New York law, "a plaintiff must allege that a defendant [1] misappropriated plaintiff's labor, skills, expenditures or good will, and [2] displayed some element of bad faith in doing so." ExpertConnect, L.L.C. v. Fowler, 18-cv-4828 (LGS), 2019 WL 3004161, at *9 (S.D.N.Y. July 10, 2019) (Schofield, J.) (quoting Schroeder v. Pinterest Inc., 133 A.D.3d 12, 30 (1st Dep't 2015)); see also ML Genius Holdings LLC v. Google LLC, 20-3113, 2022 WL 710744, at *4 (2d Cir. Mar. 10, 2022) (summary order) ("The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another with some element of bad faith.").  As to the first element, "a claim of unfair competition requires neither a finding of breach of contract nor the misappropriation of a trade secret," but a plaintiff still must "alleg[e] . . . facts that, if true, would constitute misuse of plaintiffs' property." Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co., 610 F. App'x 69, 70–71 (2d Cir. 2015) (summary order) (quoting Dow Jones & Co. v. Int'l Sec. Exch., Inc., 451 F.3d 295, 302 n.8 (2d Cir. 2006)).

Primula's unfair competition claim is premised on three courses of action allegedly taken by Franchisor.  First, Primula alleges that Franchisor "knowingly, willfully and maliciously violated the Pilot Agreement and breached Primula's confidence by misappropriating Primula's proprietary trade secrets and confidential information related to the Primula Application, including its terminology, concepts, and functionality, in order unfairly to

develop, manufacture, produce, and market competing products and services." (SAC ¶ 158.) Second, Primula alleges that Franchisor engaged in unfair competition by "denying the Pilot participants and the 500 plus franchisees nationwide access to the Primula Application in retaliation for Primula bringing this lawsuit . . . ." (Id. ¶ 160.) Third, Primula alleges that Franchisor engaged in an "improper and unfair quid pro quo in designating Procare's CRM software as the mandated child care software for all 500 plus Primrose franchisee schools," for which Franchisor obtained "substantial IT and software services at no material cost to [Franchisor]." (Id. ¶ 161.) Because of this quid pro quo, Primula alleges, Franchisor recommended Procare's new Student Age Report to its franchisees and simultaneously prevented Primula from marketing the Primula Application to the franchisees. (Id. ¶¶ 162–63.)

Critically, the only course of conduct alleged by Primula to plausibly suggest any "misappropriat[ion] or misuse[] [of] the plaintiff's property or the fruit of its labors and expenditures" is the alleged misappropriation of Primula's trade secrets and confidential information in breach of the Pilot Agreement, which is the same conduct that underlies Primula's breach of contract claim. Big Vision, 610 F. App'x at 71. "[W]here a plaintiff's unfair competition claim is based entirely on the same alleged conduct proscribed by contract, and plaintiff has pled a breach of contract claim, the unfair competition claim must be dismissed as duplicative of the breach claim." Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc., 23-cv-9000 (PKC), 2024 WL 3835264, at *8 (S.D.N.Y. Aug. 14, 2024) (quoting Hedgeye Risk Management, LLC v. Dale, 21-cv-3687, 2023 WL 6386845, at *15 (S.D.N.Y. Sept. 29, 2023) (Carter, J.)). Because Primula's claim of unfair competition is expressly premised on Franchisor's alleged breach of the confidentiality provisions of the Pilot Agreement (SAC ¶¶ 157–59), the same basis for the breach of contract claim, the unfair competition claim must be dismissed.

Primula has failed to state a claim for unfair competition, and Count Seven will be dismissed.

## VIII. Primula's Request for a Preliminary Injunction is Denied.

Because Franchisor's motion to dismiss the complaint will be granted in full, Primula's request for a preliminary injunction is denied as moot.

CONCLUSION.

Franchisor's motion for reconsideration is GRANTED, and upon reconsideration, Franchisor's motion to dismiss is GRANTED in full. Primula's motion for a preliminary injunction is DENIED. The Clerk is respectfully directed to terminate the motions (ECF 6 & 56), enter judgment for the defendant, and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       February 24, 2026